Exhibit A



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JUDGE NANDOR J. VADAS

| | |
|---|---|
| USA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. CR 07-00296 |
| vs. | ) MAG-1 |
| | ) |
| CAROL J. QUITMEYER, | ) San Francisco, CA |
| | ) Friday, 10-19-07 |
| Defendant. | ) 2:06 p.m. |
| | ) |
| _____ | ) |

**TRANSCRIPT OF PROCEEDINGS**

*(Evidentiary Hearing)*

APPEARANCES:


**For Plaintiff:**          US Attorney's Offfice
                           Northern Dist. of California
                           450 Golden Gate Avenue
                           San Francisco, California 94012
                           **BY:   WENDY MAY THOMAS,  ESQ.**
                           **-and- LAURA TERLOUW, LAW CLERK**


**For Defendant:**         Office of the Public Defender
                           450 Golden Gate Avenue - 19th Floor
                           San Francisco, California 94102
                           BY:   **ELIZABETH MEYER FALK, ESQ.**


*Reported By:*   ***Margaret "Margo" Gurule, CSR 12976,***
                 *Pro Tem Reporter - US District Court*



INDEX

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

WITNESSES FOR THE
GOVERNMENT:

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Michael Hardin | 4 | 12 | 22 | 27 |

WITNESSES FOR THE
DEFENSE:

| | Direct | Cross | | |
|---|---|---|---|---|
| Carol Quitmeyer | 29 | 44 | | |

EXHIBITS:

| | Marked | Received |
|---|---|---|
| 1 | 7 | 9 |
| A-1, A-2, A-3, A-4 and A-5 | 30 | 32 |
| B-1 | 14 | 49 |
| C-1 | 34 | 40 |
| C-2 | 34 | 40 |
| D-1 | 34 | 35 |
| D-2 | 34 | 35 |
| J | 48 | 48 |
| L | 14 | |

1   **San Francisco, California; Friday, October 19, 2007; 2:06 p.m.**

2   Courtroom C, 15th Floor; MAGISTRATE JUDGE NANDOR J. VADAS

3                             -oOo-

4            THE CLERK:  Calling Case C-07-00296, USA vs. Carol

5   Quitmeyer.  Counsel, please come to the podium and say your

6   name for the record.

7            MS. TERLOUW:  Good afternoon, Your Honor.  Laura

8   Terlouw, Law Clerk for the United States.  I'm joined by Wendy

9   Thomas and Ranger Hardin from the National Parks Services, who

10  is prepared to testify as to the facts at issue.

11           THE COURT:  Good afternoon.

12           MS. FALK:  Good afternoon, Your Honor.  Elizabeth

13  Falk, on behalf of Carol Quitmeyer.  She is present.  Also

14  present is our investigator, Frederick Anderson.

15           THE COURT:  All right.  Why don't you proceed,

16  Counsel.  It's your motion.

17           MS. FALK:  And I do understand that, Your Honor.

18  Typically, I ask the Government, since its their burden under

19  the Fourth Amendment, to present its witnesses first.

20           THE COURT:  All right.  Are you prepared to proceed,

21  Counsel?

22           MS. TERLOUW:  Yes, we are.

23           THE COURT:  All right.  First witness, please.

24           MS. TERLOUW:  Let me call Ranger Michael Hardin.

25           THE CLERK:  Please raise your right hand.

4

1    **(The witness is sworn.)**

2    **MICHAEL HARDIN**,

3    called as a witness by the Government, having been first duly

4    sworn, was examined and testified as follows:

5    THE CLERK:  Please be seated.  State your full name

6    and spell your last name, please.

7    THE WITNESS:  Michael Connelly Hardin, H-A-R-D-I-N.

8    **DIRECT EXAMINATION**

9    BY MS. FALK:

10    Q.    Good afternoon.  Ranger Hardin, where are you

11    employed?

12    A.    I'm employed by the National Parks Service at Golden

13    Gate National Recreation Area.

14    Q.    And what is your position there?

15    A.    I am a law enforcement park ranger.

16    Q.    Okay.  How long have you been employed there?

17    A.    I have been employed at Golden Gate for almost a

18    year, but I've been with the National Parks Services for 11

19    years.

20    Q.    And what are your duties and responsibilities

21    currently?

22    A.    I provide law enforcement services as well as EMS,

23    fire and search and rescue services.

24    Q.    What is your training and experience particularly

25    regarding investigations and arrests?

1      A.    I'm a graduate of the Federal Law Enforcement

2    Training Center.  I've also had four years as a military

3    policeman, and I've been to three law enforcement academies.

4      Q.    And how many arrests have you handled over the course

5    of your career?

6      A.    Of my own arrests, about 100.  I spent three years on

7    the Mexican border, and if you add immigration into that, about

8    2,000 apprehensions.

9      Q.    How many DUI arrests, approximately, driving under

10   the influence, arrests have you conducted?

11     A.    Approximately 30.

12     Q.    And do you have any training regarding arrests for

13   driving under the influence?

14     A.    Yes, I do.  In 1997, I attended a national Highway

15   Traffic Safety Administration-approved standardized field

16   sobriety.

17     Q.    Thank you.  Directing your attention to the evening

18   of January 13, 2007, in the vicinity of the north anchorage of

19   the Golden Gate Bridge, were you on duty at that date, time and

20   location?

21     A.    Yes, I was.

22     Q.    Please tell the Court what happened that evening.

23     A.    I was conducting a patrol of the security area

24   surrounding the north anchorage of the bridge.  And I had

25   reached the bottom of Lower Conzelman Road where there is a

1  gate and let myself out, when I saw headlights come around the

2  corner from the area near the fishing pier at Ft. Baker and

3  enter the series of serpentine barriers that were outside the

4  security gate.

5        The vehicle went about halfway through the barriers,

6  then started to turn around, and its progress was impeded by

7  the barriers on the edge of the roadway.

8    Q.   Okay.  And then what happened?

9    A.   I -- when the car stopped and began to maneuver to

10 turn around, I walked downwards the car.  This was unusual

11 activity.  Most people don't drive into these barricades.

12       I had my flashlight.  I shined my flashlight at the

13 car to try to attract the driver's attention.  It didn't appear

14 to work.  As I got a little close, I shouted, again trying to

15 attract the driver's attention.  It didn't appear to work,

16 either.

17       By the time I got within close proximity to the car,

18 it was about half turned with the rear of the car towards the

19 edge of the road.  There is a hill and a ditch there.  The

20 front of the car was impeded by the end of one of the Jersey

21 barriers that made up the serpentine barrier, and the driver

22 was rocking the car back and forth, appearing to try to make a

23 multiple-point turn, but again was impeded by the barrier.

24   Q.   Okay.

25   A.   At that point, I knocked on the window because all my

7

1    other efforts to get her attention didn't work.

2        Q.   Was this the passenger side window or the driver side

3    window that you knocked on?

4        A.   The passenger side window.

5        Q.   Okay.  And then what happened?

6        A.   The driver leaned over and rolled the window down,

7    but her actions lacked -- say they were a little uncoordinated.

8    I saw that her eyes were bloodshot.

9            She told me that she was lost and trying to get to

10   Sausalito.  But she spoke with a very slow, deliberate tempo,

11   all indicators, from my experience, that she may be under the

12   influence of alcohol.

13       Q.   Okay.  Let the record reflect I am holding in my hand

14   a one-page document marked Government's 1 for identification.

15           MS. TERLOUW:  Your Honor, may I approach the witness?

16           THE COURT:  You may.  Have you shown it to defense

17   counsel?

18           MS. TERLOUW:  Yes.

19           MS. FALK:  I have been previously provided a copy.

20   Thank you, Your Honor.

21           THE COURT:  Thank you.

22           MS. TERLOUW:  Let the record reflect I'm handing the

23   document to the witness.

24           THE COURT:  Well, first why don't you mark it?

25           MS. TERLOUW:  Okay.  It's marked as Exhibit 1.  I

1    offer into evidence Government's 1 for identification.

2              THE COURT:  Well, mark it first.  Let him describe

3    it.

4              MS. THOMAS:  It is marked with blue.

5              THE COURT:  All right.  Then let him describe it.

6         BY MS. TERLOUW:

7         Q.   Okay.  All right.  Officer Hardin -- Ranger Hardin --

8    excuse me -- do you recognize this document?

9         A.   Yes, I do.

10        Q.   And what do you recognize it to be?

11        A.   It's an aerial photograph of the area of the stop

12   that night.

13        Q.   Is this a fair and accurate reflection of the area at

14   the time of the arrest?

15        A.   Yes, it's -- yes, fair and accurate.

16        Q.   Okay.  And can you mark your vehicle's location on

17   the map with a Number 1 where you were when you first saw the

18   car coming towards you?

19        A.   Yes, I can.

20             MS. FALK:  Your Honor, may I just observe what the

21   witness is doing?

22             THE COURT:  Sure.

23             MS. FALK:  Okay.  I appreciate it.

24        BY MS. TERLOUW:

25        Q.   And can you also mark the location of Ms. Quitmeyer's

1    vehicle with a Number 2.

2         A.    Yes.

3              THE COURT:    Do we have an easel?

4              THE CLERK:    It's in another courtroom.    I can go get

5    it.

6              THE COURT:    We're just going to take a quick break

7    for a moment.

8                         (*Brief recess was taken*.)

9              THE COURT:    Thank you.    Why don't we attach that

10   exhibit on to the easel in one way or another.    Then everybody

11   can see it.

12             MS. TERLOUW:    Do you need a piece of tape?

13             THE COURT:    Ranger, if you need to leave your seat to

14   mark the exhibit, feel free to go back and forth.

15             MS. FALK:    Your Honor, can the Court still see the

16   exhibit?

17             THE COURT:    I can see it just fine.

18             MS. TERLOUW:    Okay.

19             THE WITNESS:    Okay.

20             MS. TERLOUW:    At this time, I would like to move into

21   evidence what has previously been marked as Exhibit 1.

22             MS. FALK:    No objection.

23             THE COURT:    It will we moved into evidence at this

24   time.

25

1      BY MS. TERLOUW:

2          Q.    Ranger Hardin, can you describe about how many

3      barriers there were on the evening in question in place at the

4      time?

5          A.    About a half dozen or so.

6          Q.    And about how tall and wide or long were these

7      barriers?

8          A.    They're about 3 feet tall, 8 feet wide or so.  It's a

9      standard concrete barrier that you see along the highway.

10         Q.    Okay.  Do you know why these barriers were in place?

11         A.    They're a security measure put in place to not allow

12     vehicle traffic to gain enough speed to be able to ram through

13     the gate.

14         Q.    And the security gate, that's the gate you're

15     referencing?

16         A.    Yes.

17         Q.    And approximately how far away is the security gate

18     from the barriers?

19         A.    Oh, 50 yards or less, I would say.

20         Q.    Were these barriers subsequently taken down?

21         A.    Yes, they were.

22         Q.    Do you know approximately when that happened?

23         A.    It was in the springtime, sometime between March and

24     May.

25         Q.    And why that decision was made, are you aware of that

1    decision?

2        A.   A better gate was put into service.  They were no

3    longer needed.

4        Q.   Okay.  When you saw Ms. Quitmeyer's vehicle,

5    approximately how much space was there between the barricades,

6    the ditch and her vehicle?

7        A.   Not much.  A foot, maybe.

8        Q.   Okay.  And you testified that you flashed your

9    flashlight in her direction to attract her attention?

10       A.   Yes.

11       Q.   What was her reaction to this?

12       A.   I saw no reaction.

13       Q.   Okay.  And when you spoke aloud to her, did you see a

14   reaction at that time?

15       A.   No reaction that time, either.

16       Q.   Okay.  And when you knocked on the window, you

17   mentioned Ms. Quitmeyer's demeanor.  Can you elaborate at all

18   on her response to your knocking?

19       A.   Well, she leaned over to the passenger side and

20   rolled the window down.

21       Q.   Did she object to anything at any point?

22       A.   No, she did not.

23       Q.   She did not object to any of your questions of her?

24       A.   No.

25

12

```
 1            MS. TERLOUW:  Your Honor, at this time the Government

 2   has no further questions.

 3            THE COURT:  All right.  Counsel.

 4            MS. FALK:  Thank you, Your Honor.  Your Honor, as a

 5   courtesy for the witness, I've prepared a binder for the bench

 6   that contains the same documents that the Court received at the

 7   last calling of the case.  I don't know if you'll need this or

 8   not.  I'm just going to --

 9            THE WITNESS:  Okay.

10                        CROSS EXAMINATION

11   BY MS. FALK:

12       Q.   Now, Ranger Hardin, these barricades were not

13   obviously placed across the entire road, correct?

14       A.   That's correct.

15       Q.   They basically came to enough of the road where a

16   vehicle could still navigate around them?

17       A.   Right.  The intention was to slow the vehicle down.

18   So you have to negotiate these barriers.  You can't just drive

19   really fast towards the gate and crash through it is, is the

20   idea.

21       Q.   And there was no sign at the beginning of the

22   barricades that said, "Stay out, don't continue," of that

23   nature?

24       A.   That's correct.

25       Q.   There is no flashing lights there warning anybody
```

13

1    that crossing into that area was somehow wrongful?

2        A.    No.

3        Q.    And in fact, you had navigated those barriers

4    yourself to get to the --

5            MS. FALK:  May I approach the stand, Your Honor?

6            THE COURT:  Uh-huh.

7    BY MS. FALK:

8        Q.    You had navigated those barriers yourself most likely

9    to get to this gate area from which you were coming from?

10       A.    I had done that in the past.  That night I came from

11   the top.

12       Q.    And I'm sorry, when you say you came from the top,

13   can you just --

14       A.    Yeah, the other end of the road.  I could show you on

15   the map.

16       Q.    Yeah, if you could just point that out, because I was

17   a little -- your testimony is a little unclear at that point

18   about what side you approached from.

19       A.    Actually, it's not on the photograph here.  But up

20   here there is a parking lot, right next to the bridge, right at

21   the -- this is the Alexander onramp from Southbound 101.  This

22   road is Lower Conzelman Road, and it continues up to that

23   parking lot.  So there is another gate set up like this one up

24   here.  I entered from uphill, and I drove down.  And I was

25   exiting down.

1     Q.    So you approached the scene from the side of the

2    Golden Gate Bridge?

3     A.    Yes, I did.

4     Q.    Now, Agent Hardin, your report references a ditch.

5    That's right?

6     A.    Yes.

7     Q.    And in fact, there is a ditch there, right?

8     A.    Right.

9     Q.    And it's a concrete ditch?

10     A.    Yes.

11     Q.    Now, I'm going to show you -- and if you could open

12    the bench book, please -- what's been marked as Defense

13    Exhibit B-1?

14          THE COURT:   Does Counsel for the Government have a

15    copy of this book?

16          MS. TERLOUW:   I do.

17          MS. FALK:   Yes, Your Honor, and I'll just state for

18    the record I have previously provided to Government's Counsel

19    all exhibits that I'm referencing here.  I just added Exhibit

20    L.  So the Court should note that.

21     Q.    Ranger Hardin focusing on the right-hand side of the

22    photograph, is that the ditch that you were referring to in

23    your testimony?

24     A.    Yes, it is.

25     Q.    And that ditch is fairly deep, isn't it?

15

1      A.    It is, yes.

2      Q.    And that ditch, looking at this picture, Government's

3  Exhibit 1, that ditch extends approximately how far back along

4  this road where the barriers used to be laid out?

5      A.    I couldn't say precisely, but it -- I don't know if

6  it extends all the way through where the barriers were, but it

7  extends into them at least to the middle.

8      Q.    So it extends to the area where Ms. Quitmeyer was

9  located?

10     A.    Yes.

11     Q.    Now, when you were earlier testifying, you mentioned

12 that the car was stuck, right?

13     A.    Yes.

14     Q.    The car was stuck in the ditch?

15     A.    It wasn't in the ditch, it was bounded by the ditch.

16     Q.    And when you say "bounded," I'm just a little bit

17 confused about what you actually mean by that.

18     A.    Had the car backed up a little bit further, the rear

19 wheels would have been in the ditch, likely that it would have

20 high-centered and been unable to get out by itself.

21     Q.    So the car wasn't stuck?

22     A.    It wasn't stuck.  It was wedged, bounded, obstruct

23 objected.

24     Q.    And I'm not trying to quibble with you about

25 terminology, but I'm genuinely confused.  "Stuck."  You would

1    agree with me that "stuck" means that the vehicle can't move?

2        A.    Yes.

3        Q.    And this vehicle was moving, right?

4        A.    A few inches, yes.

5        Q.    And Ms. Quitmeyer was attempting to turn around?

6        A.    I believe so, yes.

7        Q.    And the vehicle was not in the ditch?

8        A.    The vehicle was not in the ditch.  The vehicle was

9    unable to proceed because of the barriers that were around it.

10       Q.    And that's what I'm trying to understand.  It's not

11   clear to me what you're actually saying happened in that

12   regard.

13       A.    Okay.  Maybe this way:  The vehicle was placed such

14   that there was a barrier behind it, the ditch.  There was a

15   barrier in front of it, one of the Jersey barriers, and the

16   operator was unable to get the vehicle out of the position that

17   it was in.

18       Q.    Okay.  And perhaps if you could use Government's

19   Exhibit 1 to better illuminate that?

20       A.    This was the position of the car.  The rear of the

21   car was towards the wall.  You can kind of see the ditch right

22   there.  The front of the vehicle was facing the end of this

23   barrier right there.  So there wasn't enough room to pull

24   forward and pull out.  There wasn't enough room to go backwards

25   very far.  And so the defendant was backing the car up and

1    pulling forward repeatedly, as if to make like a three-point

2    turnaround where you back up and then turn the wheels and pull

3    forward and move the front of the car and then, you know, back

4    up again, take another bite at it.  But she was just moving

5    back and forth three to five times while standing there, not

6    making any headway.

7        Q.    Okay.  In your estimation, she wasn't making any

8    headway?

9        A.    True.

10       Q.    So you never observed her stuck in the ditch?  That

11   wasn't your observation?

12       A.    That wasn't my intention with that verbiage, no.

13       Q.    Now, let's -- I would like to move forward now to

14   discuss the approach of Ms. Quitmeyer's car.  Your -- you were

15   driving up to the gate.  And had you actually opened the gate

16   to allow your car through before you saw her car?

17       A.    No, I had not.

18       Q.    So, continue.

19       A.    I was standing at the gate, getting my keys out to

20   open the gate when I saw her approach.

21       Q.    And were your headlights on?

22       A.    Probably they were.  I would -- I can't say for

23   certain, but they should have been, yes.

24       Q.    And so --

25       A.    I don't remember now.

1    Q.    So your headlights would have been flashing in this

2  direction?

3    A.    Yes.

4    Q.    And for the record, I mean the direction facing back

5  towards the pier, towards the beginning of the barricade.  And

6  you approached Ms. Quitmeyer's vehicle, then, on foot?

7    A.    Yes, I did.

8    Q.    And you had your flashlight?

9    A.    Correct.

10    Q.    And you shined your flashlight on the car?

11    A.    Right.

12    Q.    You ordered the car to stop?

13    A.    Yeah.  I was using verbal, you know, loud, verbal --

14  I don't know if you would call it a command or whatever.  But I

15  was trying to get her attention.

16    Q.    And she continued what she was doing?

17    A.    Yes.

18    Q.    And you approached her car?

19    A.    Right.

20    Q.    With flashlight in hand?

21    A.    Right.

22    Q.    And you were in uniform?

23    A.    Correct.

24    Q.    And you knocked on the window?

25    A.    Yes.

1      Q.   And can you just -- when you knocked -- when you

2   knocked on the window, you knocked like most --

3      A.   Yes.

4      Q.   -- as if you were knocking on the door?

5      A.   (Demonstrating).

6      Q.   Like (demonstrating)?

7      A.   Right.

8      Q.   And you looked inside the vehicle?

9      A.   Yes.

10     Q.   And you were wearing the exact same outfit you're

11  wearing now?

12     A.   Dressed as I am today.

13     Q.   With your gold badge?

14     A.   Yes.

15     Q.   And your nameplate on the front of your shirt?

16     A.   Yes.

17     Q.   All right.  And you told her to roll down the window?

18     A.   I don't recall telling her to roll down the window.

19     Q.   You don't recall one way or the other?

20     A.   Correct.

21     Q.   The result of your knocking and whatever was said but

22  that you can't remember caused Ms. Quitmeyer to roll down the

23  window?

24     A.   Correct.

25     Q.   And after that, she was cooperative with you?

1     A.    Yes.

2     Q.    Now, when you were approaching her car -- and you

3  just testified that you gave loud, verbal commands.  I'm going

4  to ask you a little bit about those commands.  And do you have

5  a course of practice of approaching cars?

6     A.    Yes, I do.

7     Q.    And you probably have language that you use

8  repeatedly; is that fair to say?

9     A.    Yes.

10    Q.    And you're probably trained in these procedures,

11 right?

12    A.    Yes.

13    Q.    And you need to take caution when approaching cars,

14 I'm sure?  That's all part of your training?

15    A.    Correct.

16    Q.    So you yelled "Stop"?

17    A.    I don't recall what I yelled, but I was trying to use

18 voice to get the driver's attention, yes.

19    Q.    Do you remember the words that you said?

20    A.    No, I don't.

21    Q.    You don't remember if you said the word "stop"?

22    A.    It could well have been "stop," because it seems an

23 appropriate thing to say.

24    Q.    Let me ask you this, Officer Hardin:  Your intention

25 was to try to get the vehicle to stop moving, correct?

1    A.    Correct.  I had several concerns.

2    Q.    And your primary one was first to get her to stop

3  moving?

4    A.    Right.

5    Q.    Okay.  And so, in reflecting on the course of your

6  experience as a trained officer, in those types of

7  circumstances, is it reasonable that you probably yelled "stop"

8  or said "stop" or something of that nature to try to get the

9  stop vehicle to stop?

10    A.    It's reasonable.  I just can't testify that that's

11  what I said because I don't remember.

12    Q.    And even reflecting on the course of your experience,

13  that doesn't help refresh your recollection over the events of

14  that night?

15    A.    Of this specific event, no.  But it is reasonable to

16  assume that that could be what I said.

17    Q.    So Officer Hardin, just one last point:  The windows

18  were up at the point that you made your verbal commands?

19    A.    Yes.  At least the passenger side window was

20  definitely up.

21    Q.    And this was in January, right?

22    A.    Yes.

23    Q.    So it was pretty cold outside?

24    A.    Yes, it's cold.

25    Q.    And it's dark in that area of the Baker -- is that

22

1   still considered Baker Road, sir, or is that --

2       A.   That's -- I believe it's Miller Road coming towards

3   the pier.   The road that goes under the bridge is Lower

4   Conzelman Road.

5       Q.   And are there lights right in this area?

6       A.   There are lights by this second gate, if you move

7   your finger down just a little bit to the next.

8       Q.   I'm sorry.   Maybe it would be easier for the judge if

9   you did it?

10      A.   I believe there are lights right here, and there is a

11  second gate right here that blocks access.   I believe there are

12  lights here, security lights, not streetlights, security

13  lights.

14      Q.   But back where these barricades used to be, was there

15  streetlights there?

16      A.   No, there's no lights there.

17          MS. FALK:   Your Honor, I don't have any further

18  questions.

19          MS. THOMAS:   Your Honor, two questions.

20          THE COURT:   Please.

21          MS. THOMAS:   Ranger Hardin, just a couple of

22  questions.

23                    REDIRECT EXAMINATION

24  BY MS. THOMAS:

25      Q.   When you flashed the flashlight at the defendant to

23

1   get her attention, did she show any indication that she had

2   seen you?

3       A.   No.

4       Q.   And when you used vocal commands to try and get her

5   attention, any indication that she heard you?

6       A.   No.

7            MS. THOMAS:  No further questions.

8            THE COURT:  The Court has a few questions.  The road

9   that you described as Miller Road, this frontage road which is

10  in Government's 1, when you first saw the defendant, she was

11  coming southbound on that road?

12           THE WITNESS:  Yes, Your Honor.

13           THE COURT:  How do you get to that point?

14           THE WITNESS:  You can get there from Sausalito.

15  Alexander Avenue, at the south end of Sausalito, there is an

16  east road by the sewer plant that comes into Ft. Baker, which

17  is this area up here which would be above and to the right of

18  the photograph, or you can get there from Bunker Road, which

19  comes down where the Baker Berry Tunnel is.  So there's two

20  ways you can get there.

21           THE COURT:  And from the Alexander exit, about how

22  far is that from where you first saw the defendant?

23           THE WITNESS:  Near Sausalito?  Two-thirds of a mile,

24  maybe.

25           THE COURT:  And it's 180 degrees opposite from where

24

```
 1    Sausalito is; is that correct?

 2              THE WITNESS:  Yes, it is.

 3              THE COURT:  And when Ms. Quitmeyer rolled down the

 4    window, you indicated that her speech appeared to be somewhat

 5    slow?

 6              THE WITNESS:  Yes, Your Honor.

 7              THE COURT:  And that you observed that she had

 8    bloodshot eyes; is that correct?

 9              THE WITNESS:  That's correct, Your Honor.

10              THE COURT:  Were you close enough to her at that time

11    to smell her breath?

12              THE WITNESS:  I was close, but I didn't smell

13    anything.

14              THE COURT:  Okay.  What was her attitude like when

15    you initially -- on your initial contact with her?

16              THE WITNESS:  I would say maybe a little harried.

17              THE COURT:  Now, you indicated something called a

18    Jersey barrier.  Were those the concrete barriers, the regular

19    barriers that we see in the middle of the highway that

20    separates both Number 1 lanes?

21              THE WITNESS:  Yes.

22              THE COURT:  When you got out of your vehicle -- could

23    you describe the vehicle you were driving that night?

24              THE WITNESS:  It's a white Crown Victoria police car

25    with a green stripe down the side and an arrowhead on the door
```