1    matching my shoulder badge.

2            THE COURT:  Does it have a light bar on top?

3            THE WITNESS:  It does not have a light bar.  It has

4    the low profile lights.

5            THE COURT:  And the low profile lights are contained

6    in the windshield and the grille?

7            THE WITNESS:  Yes.

8            THE COURT:  And did you activate those when you made

9    the stop?

10           THE WITNESS:  No, I did not.

11           THE COURT:  You testified on cross-examination that

12   you had several concerns when you first saw Ms. Quitmeyer in

13   the area of the barriers that you have described.  What are

14   those concerns?

15           THE WITNESS:  Well, one, it's unusual for vehicles to

16   drive through the security measure of the barriers.  So it was

17   unusual activity coming towards a secured area, a Homeland

18   Security secured area guarding the north entrance of the

19   bridge, and that piqued my interest.  The vehicle continued

20   through and then attempted to turn around.  So I thought, you

21   know, the driver may need some help.  They may be lost.

22   Obviously we can't leave a vehicle in the barriers.  We need to

23   clear that out.

24           THE COURT:  When you first saw her, there was some

25   cross-examination about -- I don't want to say semantics, but

1    about whether she was stuck.  Did it appear to you that she was

2    unable to be able to successfully turn her vehicle around and

3    leave the area?

4             THE WITNESS:  Yes, Your Honor.  That's the way it

5    appeared to me.

6             THE COURT:  Okay.  Then, finally -- well, a couple of

7    other questions.  It was January.  What time was it?

8             THE WITNESS:  It was a little after 9:00, maybe a

9    quarter after.

10            THE COURT:  So it would have been -- except for

11   artificial lighting, it would have been pitch dark?

12            THE WITNESS:  It was dark, yes.

13            THE COURT:  Do you remember if there was a full moon

14   out?

15            THE WITNESS:  I do not remember.

16            THE COURT:  Okay.  And then finally, you testified

17   that you made approximately 30 stops for driving under the

18   influence; is that correct?

19            THE WITNESS:  That's correct.

20            THE COURT:  And you had previous training for driving

21   under the influence?

22            THE WITNESS:  That's correct, Your Honor.

23            THE COURT:  In your opinion, did the way Ms.

24   Quitmeyer attempt to negotiate the barriers, was that

25   consistent with somebody who might have been drinking?

1          THE WITNESS:  Certainly the possibility ran through

2     my mind.  I did not make that determination at that point.

3          THE COURT:  Thank you.  Nothing further.  If counsel

4     wants to ask a few more questions.

5          MS. FALK:  Thank you, Your Honor.  There is one

6     follow-up area, Officer Hardin.

7                    RECROSS EXAMINATION

8     BY MS. FALK:

9     Q.   Were you present when the tow truck came?

10         MS. THOMAS:  Objection, exceeds the scope of direct.

11         THE COURT:  I'll allow it at this time.

12         THE WITNESS:  I was not.

13    BY MS. FALK:

14    Q.   You were not there?  Was the --

15    A.   No, I was not.

16    Q.   Was one of your colleagues there?

17         MS. THOMAS:  Objection.

18         THE COURT:  It will be overruled.  I'll allow this

19    line of questioning, but do make it somewhat brief.

20         MS. FALK:  I'm not going to prolong it.

21    Q.   So you pulled Ms. Quitmeyer out of the car?

22    A.   I asked her to get out of the car, and she did.

23    Q.   And the vehicle remained in the position that you --

24    that it was in when you originally asked her to step out of the

25    car at the time you left the scene?

```
 1        A.    No.  My supervisor moved the car so the tow truck
 2   could pick it up.
 3        Q.    Your supervisor moved it?
 4        A.    Correct.
 5        Q.    And you watched that happen?
 6        A.    Yes, I did.
 7        Q.    And he was able to get the vehicle out of the
 8   barriers?
 9        A.    Yes, he was.
10        Q.    And that's without the assistance of the tow truck?
11        A.    Correct.
12              MS. FALK:  I don't have any further questions.
13              THE WITNESS:  Okay.  Thank you.
14              THE COURT:  Counsel, anything further?
15              MS. TERLOUW:  No.
16              MS. THOMAS:  No, Your Honor.
17              THE COURT:  Any further questions on the part of the
18   Government?
19              MS. TERLOUW:  No, Your Honor.
20              THE COURT:  Ms. Falk?
21              MS. FALK:  Thank you, Your Honor.  If I could just
22   have one moment.
23              THE COURT:  Please.
24              MS. FALK:  Your Honor, the defense calls Ms. Carol
25   Quitmeyer.
```

```
 1                THE COURT:  All right.

 2                THE CLERK:  Please raise your right hand.

 3                     (The witness is sworn.)

 4                     CAROL QUITMEYER,

 5    called as a witness for the Defendant herein, having been first

 6    duly sworn, was examined and testified as follows:

 7                THE CLERK:  Please be seated.  Please state your full

 8    name and spell your last name.

 9                THE WITNESS:  Carol Quitmeyer, Q-U-I-T-M-E-Y-E-R.

10                     DIRECT EXAMINATION

11    BY MS. FALK:

12        Q.    And if you would pull the microphone just a little

13    bit closer to you and maybe sit a little closer, you won't have

14    to strain.

15        A.    Okay.

16        Q.    Ms. Quitmeyer, what is your address?

17        A.    80 Lincoln Drive, Number 2-E, in Sausalito.  May I

18    pour myself some water, please?

19        Q.    Sure.  Absolutely.

20              And how long have you lived at that address?

21        A.    Just over three years now.

22        Q.    And do you own a car?

23        A.    Yes, I do.

24        Q.    And what kind of car?

25        A.    It's a 1992 Volkswagen Cabriolet.
```

1     Q.    And how long have you owned that car?

2     A.    Since it was new, January of '93.

3     Q.    Now, Ms. Quitmeyer, there is a bench book of witness

4 exhibits up there.  But I also have some originals that I'm

5 going to have to show you because they have to be marked and

6 you have to take a look at the originals, as well.

7     THE COURT:  Well, is there any dispute that the

8 documents in the bench book are not photocopies of --

9     MS. FALK:  What I'll do is I'll just provide the

10 Government with the actual photographs, Your Honor.  They are

11 exactly the same.  I mean, I'll make that representation to the

12 Court.

13     THE COURT:  Then you can just mark the ones in the

14 book.

15     MS. FALK:  I just thought, for ease of the

16 proceedings, I'd just mark them as we go along.

17     Q.    Ms. Quitmeyer, if you could turn in the book to

18 Defense Exhibit A, there are photographs in that marked 1 --

19 A-1 through A-5.

20     A.    Yes.

21     Q.    Do you recognize what's depicted in these

22 photographs?

23     A.    It's different views of my car.

24     Q.    And is this the car that you were driving on the

25 night in question?

1    A.    Yes, it is.

2    Q.    And is it the car you just described?

3    A.    Yes, it is.

4    Q.    Now, have you had any bodywork done to this car

5    between January 17, 2007 -- well, and today?

6    A.    No.

7         MS. FALK:  And Your Honor, I have Mr. Anderson here

8    who is prepared to testify.  He actually took the photographs

9    at issue as to the date, so I'll hold off and ask that they be

10   admitted until Mr. Anderson offers that brief testimony, unless

11   the Government has no objection.

12        THE COURT:  Is there any objection to the

13   photographs?

14        MS. THOMAS:  No objection.

15        THE COURT:  They'll be admitted.

16   BY MS. FALK:

17   Q.    Ms. Quitmeyer, were you present when these

18   photographs were taken?

19   A.    Yes, I was.

20   Q.    And do you remember what month they were taken in?

21   A.    I believe it was in September of 2007, a few weeks

22   ago.

23   Q.    And then Ms. Quitmeyer, how big is your car?  That's

24   a little bit of a difficult question to ask, but is it a larger

25   size car?

1        A.    No, it's a very small car.  I think someone told me

2    when the Mini was first marketed, it was the smallest car on

3    the market, but in fact, my car is only a half an inch longer

4    than the Mini.  So it's very small.

5        Q.    Very well.

6              MS. FALK:  Your Honor, I would ask that the

7    photographs in Defense Exhibit A be admitted.

8              THE COURT:  Ms. Quitmeyer, is the car that's depicted

9    in these photographs in the same or similar condition it was in

10   at the time and date in question?

11             THE WITNESS:  Yes, Your Honor.

12             THE COURT:  They'll be admitted into evidence.

13             MS. FALK:  Thank you.

14       Q.    Now I want to focus on January 17, 2007.  Where were

15   you at that evening?

16       A.    I was in San Francisco at a reception for -- I was at

17   the home of some members of my church, St. Mark's Lutheran

18   Church, in San Francisco.

19       Q.    And do you remember what address the party was at?

20       A.    I don't remember the exact address.  It was down

21   south of the Sunset District in the -- I guess it's the Forest

22   Hills area.

23       Q.    Do you remember what time you arrived at the party?

24       A.    I believe the start date or the start time was

25   5:00 p.m., and I arrived between 5:00 and -- closer to 5:30.

1    Q.    Do you remember what time you left?

2    A.    It was about 9:00, maybe just five minutes or so

3    before.

4    Q.    And did you have alcoholic beverages at the party?

5    A.    Yes, I did.

6    Q.    Now, when you left the party, were you driving?

7    A.    Yes, I was.

8    Q.    Was there anyone else in the car?

9    A.    No, there was not.

10    Q.    Now, were you driving the red Cabriolet that's

11    depicted in Defense Exhibit A when you left that party?

12    A.    Yes.

13    Q.    Now, where were you heading when you left the party?

14    A.    Home.

15    Q.    And do you remember what route you took to get home

16    from the party?

17    A.    Well, I -- the Forest Hills area is kind of twisty,

18    windy roads up on a hill.  So I had MapQuested that.  But I

19    came down the hill to 19th Avenue.  And then I took 19th

20    northbound to Park Presidio, and then that turns onto the

21    Golden Gate Bridge, northbound.

22    Q.    Now, do you remember what exit you took off the

23    Highway 101 to get home?

24    A.    Yes, I took the Alexander Street exit.

25    Q.    And is that your normal route home?

1      A.   No, it's not my normal route.  The closest exit to my

2   house would be the Rodeo Drive exit.

3      Q.   Is Alexander Street an alternative way for you to get

4   home?

5      A.   It is.  I don't take it that often, but it's a pretty

6   little road and it twists and winds along the waterfront, just

7   through downtown Sausalito.  It takes a few minutes longer, but

8   it still gets me to my house.

9      Q.   And can you see the City, the lit-up city?

10      A.   You can see the city from across the bay and -- yeah,

11   it's a pretty drive.

12      Q.   Now, Ms. Quitmeyer, to assist the Court in

13   understanding the route you took and why, could you please open

14   the witness book there to Defense Exhibit D?

15      A.   I'm sorry, D?

16      Q.   D, as in dog, and also D-2.  Okay.  Do you recognize

17   what's depicted in Defense Exhibit D-1?

18      A.   Well, it's the Golden Gate Bridge and then the area

19   just to the north of the Golden Gate Bridge.

20      Q.   And are you familiar with this area that's depicted

21   in this map?

22      A.   Yes, relatively.

23      Q.   And are the roads as depicted on this map, to your

24   knowledge, the same as the way the roadways were in existence

25   at the time of the night in question, January 17, 2007 --

1    January 13, 2007?

2        A.    Yes.

3        Q.    And then does Defense Exhibit D-1 appear to be a

4    blowup of the top of that map?

5        A.    Yes, it is.

6        Q.    It's a blowup of the top.  It's also a little bit

7    further to the north.

8            MS. FALK:  Your Honor, I would ask that Defense

9    Exhibits D-1 and D-2 be admitted.

10            THE COURT:  Any objection?

11            MS. THOMAS:  None.

12            THE COURT:  They'll be admitted.

13    BY MS. FALK:

14        Q.    Now, Ms. Quitmeyer, if you could draw, take your

15    finger -- and I possibly will post this, put this exhibit up on

16    the easel, as well.

17            MS. FALK:  I'm sorry, Your Honor, I didn't ask for

18    permission to approach.

19            THE COURT:  Go ahead.

20            MS. FALK:  Okay.  Thank you.  I'm just going to hold

21    this up.  Can the Government attorney see?

22            MS. THOMAS:  Yes.

23    BY MS. FALK:

24        Q.    Can you trace with your finger the route that you

25    took and what happened, basically, the night in question that

1    you were driving home?

2            THE COURT:  Why don't we take that up there and let

3    her use a marker so we have a better idea of what's going on.

4            MS. FALK:  Okay.  Very well.  That's an excellent

5    idea.  I have another clip.

6        Q.    Okay.  There you go, Ms. Quitmeyer, and the Court has

7    asked you to trace the route.  And basically if you can just

8    explain in laymen's terms what happened and how you wound up to

9    be at the spot that the officer stopped you?

10       A.    Well, I took the Alexander Street --

11           MS. FALK:  Can the Court see?

12           THE COURT:  The Court can see.

13           THE WITNESS:  -- exit and followed along where it

14   says Sausalito lateral, and I know that Alexander Street -- I

15   guess it isn't really Alexander Street at this point yet, but

16   it's the Alexander Street exit.  And I knew from having driven

17   it before that, at some point along here, that the road takes a

18   hairpin turn.  And I made a mistake and I took this left turn,

19   which is actually before the hairpin turn that is Alexander.

20   So by doing that, I wound up turning down and into Ft. Baker,

21   actually onto Ft. Baker Road.

22           BY MS. FALK:

23       Q.    And can you just go ahead and trace the route you

24   took with a marker?

25       A.    Sure.

37

1    Q.    Now, Ms. Quitmeyer -- thank you very much.

2    A.    Uh-huh.

3    Q.    -- if you could return to the --

4    A.    Yeah.

5    Q.    -- podium, please.  Was this the right way for you to

6    be getting home?

7    A.    No.

8    Q.    Was this essentially a wrong turn?

9    A.    Yes.

10    Q.    Why didn't you turn around and go back up Ft. Baker

11    Road, back and try to trace it back to Sausalito, whatever this

12    is called?

13    A.    The Sausalito lateral.  It was an option.  It's very

14    dark down there.  There's very few streetlights.  And the road

15    is somewhat narrow.  The road is close to the water's edge at

16    points.  And I had driven down there before.  It's been a long

17    time.  But in the late '80s, early '90s, when I had first moved

18    to California, I had friends who lived in Sausalito, and they

19    had taken me down there and shown me the way that that road, in

20    order to bypass traffic on the weekends, the road goes under

21    the bridge and comes out on the other side.

22    Q.    And to assist the Court, could you turn to Defense

23    Exhibit C?

24    A.    Yes.

25    Q.    And could you let me know if you recognize what's

1  depicted in Defense Exhibit C, and in particular focusing on

2  C-2?

3        A.    Yes.

4        Q.    Do you recognize this map?

5        A.    Yes, I do.

6        Q.    And what is it?

7        A.    It's a map that shows how the road that I was on, Ft.

8  Baker Road -- it's an old map because it shows that Ft. Baker

9  actually passes under -- I guess that's Ft. Baker Road, maybe

10 the name has changed.  But it passes under the Golden Gate

11 Bridge.  Then it comes out on the other side and eventually

12 puts you right back onto Sausalito lateral.

13       Q.    And I'm just going to extend this.  I'm going to call

14 this and clip this map also.  Can you tell me what the date of

15 the map is in Defense Exhibit 1?

16       A.    It's April 2004.

17       Q.    And can you tell me, in opposition to that, what the

18 date on the map for Defense Exhibit D-1 is?

19       A.    October 2005.

20       Q.    And then, Ms. Quitmeyer, can you just point out to

21 the Court where you were intending to continue driving that

22 night when you decided not to turn around, and if you could

23 just do that on Exhibit D.  Can you just let the judge know

24 what you were planning on doing?

25       A.    Sure.  My expectation was here, where it becomes a

1    dotted line, it used to pass under the bridge, and then it just

2    does a little winding on the other side and puts you right back

3    onto Sausalito lateral, which was where I was trying to head

4    back to.

5         Q.    And is the fact that that used to be a road, is that

6    line dotted on Defense Exhibit C-2?

7         A.    Where am I at here?  This is C-2.  Oh, you have C-2

8    up there.

9         Q.    Yeah.

10        A.    No, it's a solid line on C-2.

11        Q.    So had you been down there since any of this had

12   changed?

13        A.    The friends that lived in Sausalito moved to the City

14   about -- in the mid '90s or so, or maybe late '90s.  So it had

15   been years since I had been down there.

16        Q.    So as far as you knew, that road still went through?

17        A.    Yes.

18        Q.    So can you then, just as a final explanation, can you

19   just explain to the Court, then, why you did not turn around on

20   Baker Road?

21        A.    I didn't turn around because it's very dark.  There

22   are virtually no streetlights.  It's narrow.  And it was my

23   understanding that I could continue going forward and get back

24   onto the road that I had mistakenly turned off of.

25             MS. FALK:  Your Honor, at this time, I would ask that

1  Defense Exhibits D, D-2 -- excuse me -- D-1, D-2, C-1 and C-2

2  be admitted into evidence.

3        THE COURT:  Any objection?

4        MS. THOMAS:  No objection.

5        THE COURT:  It will be admitted into evidence.

6        MS. FALK:  Thank you.

7     Q.   Now, I want to talk about what happened when you got

8  to the gate.  You're driving down the road?

9     A.   Yes.

10    Q.   And let's focus now on Government's Exhibit 1, since

11 this is the best map we have of what it looked like at the

12 time.  Can you please, with the Court's permission, show the

13 judge -- basically, can you just trace with your finger what

14 you did with your vehicle that night, up until the point when

15 you first noticed the blockade?

16    A.   Up until the point when I first noticed it.

17    Q.   Right.  About -- in other words, where in

18 Government's Exhibit 1 did you first see any barricades or

19 gates or anything of that nature?

20    A.   Well, I was coming down this way.  And as you come

21 around the curse -- and obviously I'm in the right-hand lane, I

22 saw a gate or barricade that went halfway across the road,

23 right here, that was in front of me.

24    Q.   Was there any sign that said, "Do not enter"?

25    A.   No.

41

1       Q.    Was there any warning pad that vehicles should not

2  pass at that point that you saw?

3       A.    No, there weren't any.

4       Q.    So what did you do when you got to the first

5  barricade?

6       A.    I went around it because I couldn't really see beyond

7  it because it's dark.  So I didn't know.  There were a series

8  of barricades, so I went around it to the left.

9       Q.    At some point, did you realize that there was a

10  series of barricades?

11       A.    Yeah.  When I went around it to the left, then you

12  can see that there is another barricade there on the left and

13  it's pretty clear.  And so I realized that these were

14  continuing barricades.

15       Q.    And once you realized that, what did you try to do?

16       A.    Well, I pulled up one more and attempted to make,

17  some a three-point turn, I was facing out because I didn't want

18  to be using my backup lights because it's dark there and the

19  water is behind you.  So I was attempting to -- I knew it was a

20  very tight space, but my car turns in a very tight area.  And

21  so I was making a series of three-point turns to turn around

22  and to pull out of the area going forward.

23       Q.    And why were you trying to do that?

24       A.    Well, clearly, I couldn't get through.  It was -- the

25  area was barricaded, and going out forward made more sense than

42

```
 1    attempting to back out through these barricades when it's pitch
 2    black down there.
 3         Q.    And were you attempting to make these turns?
 4         A.    Yes, I was.
 5         Q.    And were you making three-point turns?
 6         A.    Yes, I was.
 7         Q.    And at some point, did anything catch your attention
 8    while you were making these turns?
 9         A.    As I was making these turns and I had made a couple,
10    I saw a light coming at me from the area beyond where I had
11    driven into.
12         Q.    And when you say a light --
13         A.    I saw a flashlight.
14         Q.    Was it a --
15         A.    It was like shined at me, at me in the vehicle.
16         Q.    So you saw a beam of light?
17         A.    Yes, correct.
18         Q.    Okay.  What did you do in response to that?
19         A.    I continued trying to make my three-point turns.
20         Q.    And why was that?
21         A.    Because it's dark down there and I wasn't going to
22    just stop for somebody when, you know, I couldn't.  I mean, I
23    was just trying to turn around.  There was no reason for me to
24    stop for a light that was being shined at me.
25         Q.    At some point, did a person or thing make contact
```

43

1    with your vehicle?

2        A.    Yes.  Well, then someone came toward the vehicle and

3    yelled "Stop".

4        Q.    Okay.  And did you see who that was?

5        A.    As he got closer, I saw that it was someone in

6    uniform, yes.

7        Q.    And did you continue to do what you were doing?

8        A.    I believe at that point, I stopped.  I may have

9    continued for another -- another try or so.  But he was

10   continuing toward me and yelling at me to stop and then came up

11   and knocked on the car window.

12       Q.    Did he say anything to you?

13       A.    He told me the roll down the window.

14       Q.    Did you believe you had a choice to not comply with

15   the officer's direction?

16       A.    No.

17       Q.    Did you, in fact, roll down the window?

18       A.    I did.

19       Q.    Now, just to go back in a little bit more detail, did

20   the officer cross in front of your car at all, or do you

21   remember exactly how he approached your car?

22       A.    To my recollection, yes, he crossed in front of the

23   car and approached the driver's side.

24       Q.    And that's how you recall the incident?

25       A.    Yes.

44

1    Q.    Were you stuck at any point during this incident?

2    A.    No.

3    Q.    Were you at any point unable to more your car

4    forward?

5    A.    No.

6    Q.    Did you think anything was amiss at the time that you

7    were attempting to do these three-point turns?

8    A.    No.   It's a small space, but I have a very small car.

9    Q.    Did any scratches result on your car from this

10   incident?

11   A.    No.

12   Q.    And were you ever -- did your vehicle ever get stuck

13   in any ditches or anything like that during this incident?

14   A.    Not while I was with the vehicle, no.

15   Q.    Were you present when the vehicle was towed?

16   A.    No, I was not.

17         MS. FALK:  Your Honor, thank you.  I have no further

18   questions of Ms. Quitmeyer.

19         THE COURT:  Counsel.

20         MS. THOMAS:  Your Honor, may I inquire.

21                     CROSS EXAMINATION

22   BY MS. THOMAS:

23   Q.    Ms. Quitmeyer, you lived in Sausalito for three

24   years, correct?

25   A.    Now it's been three years.  At that time, it was more

45

1    like two and a half, yeah.

2        Q.   And you have had the Cabriolet since when?

3        A.   Since January of 1993.

4        Q.   So approximately 14 years, correct?

5        A.   Yes.

6        Q.   And it's your testimony you saw the barriers before

7    you went past them, correct?

8        A.   I saw the first barrier, the barrier on the right,

9    yes.

10       Q.   And you proceeded to drive past it, correct?

11       A.   Yes.

12       Q.   And it's your testimony that you were, after you

13   acknowledged that it was a barrier making a three-point turn to

14   turn around, correct?

15       A.   Correct.

16       Q.   And you saw a flashlight being flashed in your face

17   and continued moving your car, correct?

18       A.   Yes.

19       Q.   And you heard someone yelling at you and continued

20   moving your car, correct?

21       A.   Yes.

22       Q.   And it's your recollection that he approached the

23   driver's side window; is that your testimony?

24       A.   Yes, I believe so.  To my recollection, he crossed in

25   front of the car and then came to the driver's side window,

46

1    yes.

2        Q.    But that would have been the side of the car that was

3    farthest away from him, wouldn't it be?

4        A.    No, because I was turning with the headlights toward

5    the water side and the -- and the hill was behind me.

6        Q.    All right.  So your headlights were towards the

7    water, correct?

8        A.    Yes.

9            MS. THOMAS:  Your Honor, may I approach Government's

10   Number 1?

11           THE COURT:  Please.

12      BY MS. THOMAS:

13       Q.    Ms. Quitmeyer, it's your testimony that the front of

14   your car was facing this direction, correct?

15       A.    Yes.

16       Q.    So the rear of your car would then we abutted against

17   the ditch, correct?

18       A.    Correct.

19       Q.    So if he approached your vehicle, he would approach

20   from the passenger side, correct?

21       A.    Correct.

22       Q.    So when he knocked on the window, he would be

23   knocking on the passenger side window; is that correct?

24       A.    But he crossed in front of my car.

25       Q.    So it's your testimony he walked in front of your

1  car, around it, and then knocked on the driver's side window?

2      A.    Yes.

3              THE COURT:  The Court has a quick question.  While

4  you were continuing to move the car back and forth?

5              THE WITNESS:  Yes.

6              THE COURT:  Thank you.

7              THE WITNESS:  Oh, no, Your Honor, I mean not once he

8  walked in front of my car, because I couldn't continue to move

9  it back and forth when he was that close to the car.

10             THE COURT:  But you were moving the car back and

11 forth while he was approaching it?

12             THE WITNESS:  Yes.

13             THE COURT:  Thank you.

14             MS. THOMAS:  No further questions, Your Honor.

15             THE COURT:  Counsel, any redirect?

16             MS. FALK:  No, Your Honor, no redirect.

17             THE COURT:  I have a couple of questions.  The

18 photograph depicted in Government's 1 shows approximately six

19 concrete barriers spaced opposite to each other one in each

20 lane --

21             THE WITNESS:  Uh-huh.

22             THE COURT:  -- three in the left lane and there would

23 be three in the right lane.  How many of these barriers did you

24 pass before you attempted to turn around.

25             THE WITNESS:  Well, I passed first one because I

48

1  didn't realize it was a series of barriers.  Then I saw the

2  second one and realized that I had gotten into a series of

3  barriers.  But I passed the second one so that I could turn the

4  front of my car outwards towards the water since that seemed

5  like the more prudent way to conduct the three-point turns

6  because it's so dark down there that I wanted my headlights to

7  be shining on the water side.  I'm sorry.  Was that clear, Your

8  Honor.

9            THE COURT:  It was.

10           THE WITNESS:  Okay.

11           THE COURT:  And one other question.  You indicated, I

12  believe, that you're in real estate; is that correct?

13           THE WITNESS:  No, I'm not.

14           THE COURT:  All right.  No further questions.

15           THE WITNESS:  Okay.

16           MS. FALK:  Thank you, Your Honor.  I have no -- Your

17  Honor, we only have one additional witness, unless the

18  Government is willing to stipulate to the admissibility of

19  Defense Exhibit J, which is documentation from Corte Madera Tow

20  that there was no extraction bill to this account.

21           THE COURT:  Well, I think the officer testified that

22  his supervisor moved the car out of the barricade area.

23           MS. THOMAS:  Yes, and the Government is willing to so

24  stipulate.

25           THE COURT:  All right.  Based on the stipulation,

```
 1   Defense J will be admitted into evidence.

 2              MS. FALK:  Thank you, Your Honor.  And my last -- I

 3   think that I also forgot to admit Government -- Defense

 4   Exhibit B.  And the particular thing is B-1, which was the

 5   photo of the ditch, which is the only picture that I asked the

 6   officer about.  I would ask that Defense Exhibit B-1 be

 7   admitted, just to show the general nature of the ditch.

 8              THE COURT:  Any objection?

 9              MS. THOMAS:  Your Honor, I have no objection.  I was

10   just wondering when this photograph was taken.

11              THE COURT:  I think it's clear that this was after

12   the retrofit.  So the Court won't take into consideration the

13   barrier except for the limited purpose to illuminate how the

14   ditch was on the date and time in question.

15              MS. FALK:  Thank you, Your Honor.

16              MS. THOMAS:  Thank you, Your Honor.

17              THE COURT:  B-1 will be admitted into evidence.

18              MS. FALK:  Thank you, Your Honor.  I have no further

19   witnesses, Your Honor.

20              THE COURT:  Any rebuttal?

21              MS. THOMAS:  No, Your Honor.

22              THE COURT:  The matter is submitted?

23              MS. FALK:  The matter is submitted.

24              MS. TERLOUW:  Yes, Your Honor.

25              THE COURT:  Fine.
```

1    MS. FALK:  Your Honor, what I was going to suggest,

2  and I can do this in a very short time frame, I would like an

3  opportunity to brief this in writing, just because I think it

4  will be more efficient use of the Court's time for me to

5  solidify my arguments to paper.

6    THE COURT:  Why don't we do this:  I'm starting a

7  jury trial Monday in Eureka, anticipating about a week to a

8  week and a half.  So can you have something to the Court by

9  Friday, November 2nd?

10    MS. FALK:  I definitely can.

11    THE COURT:  Okay.  And Counsel, how much time would

12  you like to respond?  One week?

13    MS. THOMAS:  By the 9th would be fine.

14    THE COURT:  The response by close of business Friday

15  the 9th, and the Court will rule.

16    MS. FALK:  Thank you for the opportunity for further

17  briefing, Your Honor.  I do appreciate that.

18    THE COURT:  Fine.  Anything further at this time?

19    MS. TERLOUW:  Nothing further.

20    THE CLERK:  Court is adjourned.

21          (Proceedings concluded at 3:04 p.m.)

22

23

24

25

MARGARET "MARGO" GURULE, CSR
Pro Tem Reporter – US District Court

51

1                    CERTIFICATE OF REPORTER

2          I, MARGARET "MARGO" GURULE, Pro Tem Court Reporter

3    for the United States Court, Northern District of California,

4    hereby certify that the foregoing proceedings in Case

5    No. 07 CR 00296, USA v. Carol Quitmeyer, were reported by me, a

6    Certified Shorthand Reporter, and were thereafter transcribed

7    under my direction into typewriting; that the foregoing is a

8    true record of said proceedings as bound by me at the time of

9    filing.

10         The validity of the reporter's certification of said

11   transcript may be void upon disassembly and/or removal from the

12   court file.

13

14         _____
                 MARGARET "MARGO" GURULE
15               CSR No. 12976
                 October 26, 2007
16

17

18

19

20

21

22

23

24

25